### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **VICTORIA L. FRIDAY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 3:08-CV-0538-K** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

### AMENDED FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

The findings, conclusions, and recommendation entered April 13, 2009, are hereby vacated and these amended findings, conclusions, and recommendation are now the findings, conclusion, and recommendation of the United States Magistrate Judge. This case has been referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b) and the order of the District Court filed on March 27, 2008. The findings, conclusions, and recommendation of the Magistrate Judge follow:

### Procedural History[1]

On June 28, 1999, Plaintiff, Victoria L. Friday ("Plaintiff" or "Ms. Friday"), filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act. (Tr. 75-77; 46.) The Commissioner of the Social Security Administration ("Commissioner") denied her claim initially by a September 8, 1999 Notice, and again on

---

[1] The Procedural History is taken from Plaintiff's brief. Because the Commissioner has filed a Motion to Reverse and Remand, the Court takes these background facts as undisputed.

reconsideration by a December 15, 1999 Notice of Reconsideration.  (Tr. 48-52; 53; 55-58.) Plaintiff then filed a request for hearing.  (Tr. 59.)

Administrative Law Judge ("ALJ") Ward D. King conducted a *de novo* administrative hearing on August 9, 2000, in Fort Worth, Texas.  (Tr. 62; 21-45.)  Ms. Friday appeared at the hearing with her non-attorney representative, Ruth Smith ("Representative Smith"), and testified. (Tr. 24-40.)  The ALJ called Carol Bennett to testify as a vocational expert ("VE").  (Tr. 69; 40-43.) The ALJ subsequently issued a Notice of Decision – Unfavorable on August 25, 2000.  (Tr. 7-17.) Ms. Friday, through Representative Smith, requested Appeals Council review of the ALJ's decision on October 16, 2000, which was denied by routine Notice dated March 7, 2001.  (Tr. 5-6; 3-4.)

After Ms. Friday exhausted her administrative remedies, she timely commenced her first civil action seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g). *Friday v. Barnhart*, CA No. 3:01-CV-0901-X (N.D. Tex – Dallas Div.) ("2001 Action").  Plaintiff filed her Motion for Summary Judgment and Brief in Support; then, the Commissioner filed his first Motion to Remand pursuant to sentence four of 42 U.S.C. § 405(g).  (Tr. 235-237; 231-234.)  The presiding judge granted the Commissioner's unopposed motion by Judgment entered January 17, 2002.  (Tr. 230.)  In turn, the Appeals Council issued an order dated February 13, 2002, remanding Ms. Friday's case to an ALJ for further proceedings consistent with the Judgment.  (Tr. 238-239.)

ALJ King convened the remand hearing on June 17, 2003, in Fort Worth.  (Tr. 245; 361-388.)  Ms. Friday appeared with Representative Smith and testified.  (Tr. 366-387.)  The ALJ called Shelly Eike to appear as a VE, but did not call the VE to testify.  (Tr. 257; 363-388.)  ALJ King issued his second Notice of Decision – Unfavorable on July 10, 2003.  ALJ King found that "the medical evidence establishes that Ms. Friday has 'severe' impairments in the form of major

2

depressive disorder, peripheral neuropathy, and systemic lupus erythematosus," but found that she did not meet a listing. (Tr. 221.) ALJ King again found Ms. Friday "not disabled." (Tr. 217-227.) Pursuant to 20 C.F.R. § 404.984(d), Ms. Friday elected to forego filing exceptions to the ALJ's decision with the Appeals Council, and since the Appeals Council did not otherwise assume jurisdiction, the ALJ's decision became the final decision of the Commissioner on September 9, 2003. 20 C.F.R. § 494.984(d).

Ms. Friday then commenced a second civil action on November 5, 2003. *Friday v. Barnhart*, CA No. 3:03-CV-2700-H (N.D. Tex – Dallas Div.) ("2003 Action"). After Plaintiff filed her Motion for Summary Judgment and supporting brief , the Commissioner filed a second Motion to Reverse and Remand pursuant to sentence four of 42 U.S.C. § 405(g) on August 20, 2004. (Tr. 429-432.) The late Hon. Barefoot Sanders granted the Commissioner's motion by an Agreed Judgment entered August 23, 2004. (Tr. 427-428.) The Appeals Council then issued an order, dated September 11, 2004, remanding Ms. Friday's claim for further proceedings pursuant to the Court's Agreed Judgment. (Tr. 421-424.)

On remand, ALJ William H. Helsper held Ms. Friday's third administrative hearing on July 13, 2005, in Fort Worth. (Tr. 459; 568-587.) Ms. Friday appeared with Representative Smith and again testified. (Tr. 571-580.) The ALJ called Internist Stephen Eppstein, M.D., an internal medicine specialist, to appear as a medical expert ("ME") and Todd Harden to appear as a VE. (Tr. 580-584; 585-586.) The ME testified that, due to her depression, Ms. Friday would probably have some difficulty responding appropriately from an emotional standpoint in a workplace situation. (Tr. 582.) He further testified that the treating psychiatrist could probably make a reasonable assessment of the patient's functioning. (*Id.*)

3

ALJ Helsper issued his Notice of Decision – Unfavorable on August 25, 2005, finding Ms. Friday "not disabled" for the third time.  (Tr. 394-409.)  The ALJ noted that the District Court remanded the case for reassessment of the claimant's physical and mental residual functional capacity.  This time, based on the same mental health evidence that Judge King had considered, ALJ Helsper found that the major depressive disorder is not a severe impairment, even though on July 10, 2003, Judge King had found the major depressive disorder to be a severe impairment.  Ms. Friday filed exceptions to the ALJ's decision with the Appeals Council on September 6, 2005.  (Tr. 292.)  However, by Notice dated November 26, 2005, the Appeals Council declined to assume jurisdiction, making the ALJ's August 2005 decision the Commissioner's final decision.  (Tr. 389-391.)

Ms. Friday commenced her third civil action on January 27, 2006.  *Friday v. Barnhart*, CA No. 3:06-CV-0173-M/BD (N.D. Tex – Dallas Div.) ("2006 Action").  After Plaintiff filed her Motion for Summary Judgment and supporting brief, the Commissioner brought his third Motion for Remand pursuant to sentence four of 42 U.S.C. § 405(g).  (Tr. 610-614.)  The Hon. Barbara M.G. Lynn granted the Commissioner's motion by Agreed Final Judgment entered January 22, 2007.  (Tr. 608-09.)  Judge Lynn ordered:

> On remand, the Administrative Law Judge ("ALJ") will reevaluate Friday's mental health impairments.  On remand, an ALJ shall **obtain evidence from a psychiatric or psychological medical expert  to determine the nature and severity of Friday's mental impairments on or prior to December 31, 2003. The expert will specifically evaluate whether the July 11, 2005, treating physician's opinion is consistent with the clinical evidence contained in the record during the relevant period.**  Vocational expert evidence shall also be obtained.

(Tr. 608)[Emphasis supplied].  The Appeals Council issued its remand order on April 30, 2007.  (Tr. 617-618.)  The Appeals Council instructed in part:

> The hearing decision indicates that the claimant has no severe mental impairment as or prior to December 31, 2003 (TR 407). Medical records reveal that the claimant has received treatment for depressive symptoms since 1998 (TR 150). She has been prescribed various medications which improved her symptoms (TR 269-284, 325-358, 510-558). However, she continues to be diagnosed with mild to moderate depression. Medical expert testimony is needed to clarify the nature and severity of the claimant's mental impairment during the period at issue. The expert will specifically evaluate whether the July 11, 2005 treating psychiatrist's opinion is consistent with evidence contained in the record during the relevant period.

(Tr. 617.) Thus, the Appeals Council completely disregarded Judge Lynn's explicit instruction that an ALJ shall obtain evidence from a psychiatric or psychological medical expert. The ALJ also disregarded it. He noted that "[s]pecifically, a medical expert is to evaluate whether the July 2005 treating physician's opinion is consistent with the clinical evidence contained in the record during the relevant period." However, he then referred to his own analysis to conclude that the opinion was not consistent, thus casting himself in the role of medical expert. (Tr. 602.)

ALJ Helsper held Ms. Friday's fourth administrative hearing on October 11, 2007, in Fort Worth. (Tr. 623; 711-733.) Ms. Friday appeared with Representative Smith and testified a fourth time. (Tr. 714-724.) The ALJ again called VE Harden to testify. (Tr. 725-728; 728-733.) The ALJ also called ME Eppstein, an internal medicine specialist, the same medical expert he had called in the proceeding that Judge Sanders reversed and remanded. During the ALJ's direct examination of the internal medicine specialist, he did not ask any questions about the "nature and severity of Ms. Friday's mental impairments on or prior to December 31, 2003," as explicitly ordered by Judge Lynn. (Tr. 725-26.) On cross-examination, Ms. Friday's non-attorney representative raised the issue of whether the assessment of Ms. Friday's psychiatrist would be a valid assessment of functioning. The internal medicine specialist replied that he would have no reason not to accept the psychiatrist's assessment. (Tr. 728.)

5

ALJ Helsper issued his second Notice of Decision – Unfavorable on November 28, 2007, once again finding, as he did in the previous hearing, that Ms. Friday's mental illness was not severe and that she was "not disabled." (Tr. 588-604.) Ms. Friday elected to forego filing exceptions to the ALJ's decision with the Appeals Council pursuant to 20 C.F.R. § 404.984(d) and commenced this, her fourth, civil action requesting review of her disability claim on March 27, 2008.

In this case, both parties request a remand to the ALJ. A district court is authorized to remand a social security case under sentence four of 42 U.S.C. § 405(g), which provides that "the court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). Therefore, because the parties in this case seek a sentence four remand, the District Court is required to enter a substantive decision "affirming, modifying, or reversing" the ALJ's order before remanding Plaintiff's claim to the Commissioner.[2] *Istre v. Apfel*, 208 F.3d 517, 520 (5th Cir. 2000).

## Standard of Review

A claimant must prove that she is disabled for purposes of the Social Security Act to be entitled to social security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security

---

[2] Unlike sentence six, sentence four does not contain any statutory limits on the ability to supplement the record on remand. However, recognizing that many Social Security applicants are represented by non-lawyers or have no representation at all, and most are indigent, some courts consider that the delay in final disposition of claims may sometimes make requests by the Commissioner for additional proceedings a matter of concern. Some circuit courts have ordered benefits in cases where the entitlement is not totally clear, but the delay involved in repeated remands has become unconscionable. *See, e.g., Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (remanding for payment of benefits in light of "substantial evidence" of a severe mental disability and "considerable inexplicable delays" resulting in passage of ten years since application).

Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  In this case, the ALJ determined that Plaintiff had not met her burden at Step four to prove her disability under the Act.

The Commissioner's determination is afforded great deference.  *Id*.  Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by

substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

To prevail on a claim for disability insurance or SSI benefits, a claimant bears the burden of establishing that he or she is disabled, defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505, 416.905(a). Substantial gainful activity is defined as "work that [i]nvolves doing significant and productive physical or mental duties; and [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Background

## Age, Education, and Experience

Plaintiff was born March 8, 1951. (Tr. 75; 24; 366.) She was 47 years old on June 4, 1998, her alleged onset date of disability. (*Id.*) She was considered a "younger individual" until her fiftieth birthday in March 2001. *See* 20 C.F.R. § 404.1563. Thereafter, she was considered an individual "closely approaching advanced age" throughout the remaining period under consideration in her disability claim. *See id.* Ms. Friday's insured status expired on December 31, 2003, her

"date last insured" ("DLI").  (Tr. 95.)  Ms. Friday graduated from high school in 1969.  (Tr. 92; 25; 366; 571.)  She has no higher education or formal vocational training.  (Tr. 92; 25; 366-367.)

Ms. Friday has not worked since her alleged disability onset date in June 1998.  (Tr. 593.) She began working for Southwestern Bell soon after graduating from high school and stayed with the company for her entire 28-year working career.  (Tr. 87.)  ALJ King noted that Ms. Friday had a "very good work record."  (Tr. 224.)  During the last 15 years of her tenure with Southwestern Bell, Ms. Friday worked as a customer service representative, which involved testing phone lines and dispatching repair technicians.  (Tr. 87; 26.)  VE Harden testified that Ms. Friday's past occupation is skilled and requires sedentary exertion.  (Tr. 585; 729.)  The ALJ found that during her insured period, Ms. Friday suffered from "peripheral neuropathy; migraine headaches; systemic lupus erythematosus ["SLE"] versus connective tissue disease versus a lupus-like disease; and she was status-post right knee arthroscopy, which constituted 'severe' impairments."   (Tr. 593.) Notably, the ALJ did not find that Ms. Friday's mental impairment was severe, although a previous ALJ had determined, based on the same evidence, that the same mental impairment was severe.

Plaintiff contends that the ALJ erred in ruling at Step 2 of the sequential evaluation of disability that Ms. Friday does not suffer from a "severe" mental impairment.  Plaintiff requests the Court to consider three issues.

## Issues

A.     Whether the ALJ failed to comply with Judge Lynn's January 2007 Agreed Final Judgment ordering him to obtain evidence from a psychiatric or psychological medical expert.

B.     Whether the ALJ erred in ruling at Step 2 of the sequential evaluation of disability that Ms. Friday did not suffer from a "severe mental impairment" during the period at issue.

C.     Whether the ALJ's finding that treating psychiatrist Davis's mental residual
functional capacity opinions are not consistent with the clinical evidence of
record is supported by substantial evidence.

### Findings and Conclusions

Although Ms. Friday presents three component issues, the controlling contentions are that

this case should be reversed and remanded with instructions to pay benefits because of the

Commissioner's latest violation of the mandate rule in this case and because substantial evidence

does not support the ALJ's decision that Ms. Friday is not disabled because she has both the mental

and physical RFC to perform her past relevant work as a customer service representative.

The mandate rule provides that a lower court on remand must implement both the letter and

the spirit of the appellate court's mandate and may not disregard the explicit directives of the

appellate court.  *Brown v. Astrue*, ___F. Supp.2d ___, No. 3:08-CV-0540-D, 2009 WL 330086, *3

(N.D. Tex. Feb. 11, 2009) (Fitzwater, J.).    "In Social Security proceedings, the district court's

position to the Appeals Council (and indirectly, the ALJ) is analogous to that of the court of appeals'

position with respect to a trial court."  *Id.* at n.3 (quoting *Ischay v. Barnhart*, 383 F. Supp.2d 1199,

1215 (C.D. Cal. 2005).  The Commissioner is not entitled to endless opportunities to apply the

proper legal standard correctly and gather evidence to support his conclusion.  *Miller v. Chater*, 99

F.3d 972, 978 (10th Cir. 1996).

Here, the Appeals Council and the ALJ clearly violated not only the spirit but the letter of

Judge Lynn's order by failing to "obtain medical testimony from a psychiatrist or psychologist

regarding Plaintiff's mental impairments on or before [her DLI]."  At the hearing, no testimony

"address[ed] whether treating psychiatrist Dr. Sandra Davis's July 2005 assessment of Plaintiff's

10

mental functioning is consistent with Plaintiff's treatment records during the period at issue," as explicitly ordered by Judge Lynn.

When a court has no basis to conclude that additions to the record might support the Commissioner, remand for further administrative proceedings is futile. *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991). The ten-year anniversary of the date Ms. Friday filed her application with the Commissioner will arrive on June 28, 2009. (Tr. 75-77; 46.) Ms. Friday's insured status for disability insurance benefits expired over five years ago, before the July 2005 and October 2007 remand hearings conducted by ALJ Helsper. Four times Ms. Friday has appealed the Commissioner's decision to this Court. Four times the Commissioner has admitted error and sought to have the case reversed and remanded for further proceedings before the Commissioner. This time, the Commissioner requests the District Court to issue the **same order and explicit directives** for remand that Judge Lynn issued on January 22, 2007, **explicit directives with which the Appeals Council and the ALJ failed to comply on the latest remand**. (Tr. 610-14.) The ALJs twice have failed to comply with this Court's orders on remand. (*Id*.) After four administrative hearings, two Appeals Council reviews, and three civil actions, the Commissioner has had clear directions from this Court which it has failed to follow. The Commissioner has had more than ample opportunities to apply the law accurately. The decision of an appellate court, reversing a summary judgment of the district court without remand to the Commissioner, is instructive:

> These deficiencies in the findings of the ALJ are not attributable to any error of the claimant. . . . Smith has already had two hearings before an ALJ, followed by two petitions to the Appeals Council, two appeals to the United States District Court . . . and an appeal to this court. . . . Must an indigent claimant, who has already battled for seven years, wait with the patience of Job for yet another remand before he can collect the relatively modest amounts available through such an award? We think not . . . . [T]he majority believes a further remand would be unnecessary and a contravention of fundamental justice.

11

*Smith v. Califano*, 637 F.2d 968, 973 n.1 (3d Cir. 1981).  Another appellate court, facing a situation

similar to the one before this Court, stated:

> We are convinced that Bradley proved that he cannot return to any past relevant
> work.  Ordinarily, the burden would then shift to the Secretary, and he would be
> given a chance to prove that there are other jobs that Bradley can perform. However,
> there has already been one remand and we are not confident that a second remand
> will produce a correct decision.

*Bradley v. Bowen,* 800 F.2d 760, 765 (8th Cir. 1986).   As in *Bradley*, if this was an ordinary case,

the Commissioner would be given the opportunity to prove that there are other jobs that Ms. Friday

could have performed during the period in question.  *Id.*   However, the Commissioner has given this

Court no reason to believe that an ALJ will obey the mandate rule if this case is remanded for the

fourth time.   The District Court may direct an award of benefits if the uncontroverted evidence

clearly establishes that the claimant is entitled to relief.  *Taylor v. Bowen*, 782 F.2d 1294, 1298-99

(5th Cir. 1986.)

### The ALJ's Decision

The ALJ adopted the opinion of the non-examining state agency consultant ("SAMC"), Dr.

Boulos, to rule at Step 2 that Ms. Friday's major depressive disorder was not "severe" at any time

before her DLI.  (Tr. 593; 602.)[3]  The SAMC's opinion was based upon his December 1999 review

of Ms. Friday's medical records.  This record review took place two and one-half years before

Plaintiff began seeing her psychiatrist on a regular basis in July 2002. (Tr. 342-358.) The ALJ ruled

---

[3] The ALJ gave controlling weight to the SAMC's December 10, 1999 opinion that Ms. Friday did
not have a "severe" mental impairment, despite updated psychiatric evidence of her regular and
extensive treatment by a psychiatrist beginning in July, 2002.  However, the ALJ declined to give
controlling weight to the SAMC's physical assessment because of updated medical evidence of
Plaintiff's physical condition.  This is an example of how the ALJ picked and chose only evidence
that would support the ALJ's conclusion that Ms. Friday was not disabled.

at Step 3 that Ms. Friday's impairments, either singly or in combination, do not meet or medically equal the criteria of any of the Listings of Impairments in Appendix 1. (*Id.*)  Before proceeding to Step 4, the ALJ assessed Ms. Friday's physical RFC as limited to the full range of sedentary work.[4] (Tr. 603.)  He did not find that she was limited in any way in performing mental or other non-exertional activities of work.  For the reasons that follow, this Court finds that substantial evidence does not support the ALJ's decision.  Further, upon review of the record, the Court finds that additional fact-finding is unnecessary here.  Due to the actions of the agency during the last nine and one-half years, Ms. Friday is now seeking benefits beginning July 31, 2002, the date she began regular psychiatric treatment.  Additionally, a second order to clarify the record -- assuming that the same order that was previously ignored would be followed when issued for the second time -- is not warranted here.  Substantial evidence does not support the Commissioner's finding that Ms. Friday can perform her past relevant work as a customer service representative.

### Relevant Medical Evidence

In 1983, at age 32, Ms. Friday received bilateral silicone breast implants following a double mastectomy for fibrocystic disease. (Tr. 159; 122.)  When a November 1995 MRI revealed evidence of bilateral silicone bleeding, Dr. Raymon Faires surgically removed her silicone breast implants. (Tr. 123.)  In the meantime, Ms. Friday had begun to experience numbness in her hands and feet. (Tr. 122.)  After a neurological consultation in October 1994, Dr. Susan Blue diagnosed her as suffering from peripheral neuropathy and depression.  (*Id.*)  Nearly a year later in August 1995, an anti-nuclear antibodies ("ANA") test was positive with a speckled pattern consistent with SLE.  (*Id.*)

---

[4] The full range of sedentary work requires the ability to lift up to 10 pounds at a time; to sit continuously for two hour intervals before a scheduled break and for a total of about six hours of an eight-hour workday; and to stand and walk for a total of about two hours of an eight-hour workday. SSR 96-9p, 1996 WL 374185 *3 (July 2, 1996).

Ms. Friday took disability leave from her job at Southwestern Bell for nine months after the removal of her breast implants, but diligently returned to work in 1997 while undergoing further testing and treatment for her leg, back, and joint paint. (Tr. 159.) In April 1997, she went to the Mayo Clinic in Phoenix, Arizona, for examinations. (Tr. 123.) The evaluation resulted in diagnoses of pain disorder, depression, and the autoimmune disease Raynaud's phenomena. (*Id.*)

Ms. Friday also consulted Dr. Abdul Itani at the Health South Pain Management Center in April 1997. (Tr. 123). Dr. Itani administered a lumbar block injection for back and hip pain in May 1997 and a bilateral sacroiliac block for hip pain in June 1997. (*Id.*) Ultimately, Ms. Friday's chronic pain and fatigue forced her to stop working in June 1998.

Soon thereafter, in October 1998, Ms. Friday was referred to rheumatologist David Burns, M.D., in Houston. (Tr. 162.) By that time, she was taking eight to ten tablets of the opioid analgesic medication Loracet each day for pain relief. (Tr. 159.) On his initial physical examination, Dr. Burns found tenderness at the right metacarpal joints and right wrist as well as swelling in the left ankle. (*Id.*) He further found an absent left bicep reflex and diminished pinprick sensation of the mid-forearms and shins. (*Id.*) Dr. Burns stated, "[Ms. Friday's] life is one of misery because of the chronic pain, and functionally, she is becoming quite impaired. (*Id.*)

The following month, her right wrist continued to be swollen from the palmar aspect up into the lower forearm. (Tr. 152.) Similarly, her left ankle continued to be diffusely swollen. (*Id.*) Dr. Burns prescribed weekly gamma globulin shots for her joint symptoms and neuropathy. (*Id.*) Finally, after multiple lab studies, including another positive ANA test, two MRIs, various medication trials, and repeated clinical examinations, Dr. Burns tentatively diagnosed Ms. Friday as suffering from SLE in early 1999. (Tr. 148.)

SLE is a chronic autoimmune disease characterized clinically by constitutional symptoms and signs, such as fever, fatigability, malaise, weight loss, and multiple body systems involvement with unpredictable exacerbations and remissions. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.00(B)(1); Dr. Michael Belmont, Medical Director, Hospital for Joint Disease, New York University Medical Center, *Lupus Clinical Overview*, http://cerebel.com/lupus/overview.htm. The Commissioner's Listing 14.02 recognizes that SLE can cause joint impairment, ocular impairment, neurological impairment, or mental impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.02A.

Ms. Friday could not tolerate the anti-inflammatory medication Arthrotec prescribed by Dr. Burns, and, by February 1999, her joint symptoms had worsened. (Tr. 145.) Dr. Burns noted "objectively swollen, tender joints, large and small" on clinical exam. (*Id.*) He aspirated three ccs of fluid from her swollen right knee and injected steroids and analgesics for pain relief. (*Id.*) In April 1999, Dr. Burns reported that Ms. Friday's neuropathy was worse, as she had begun tripping when outdoors and dropping items. (Tr. 139.) He directed her to use a cane to ambulate and adjusted the dosages of her gamma globulin injections. (*Id.*)

Dr. Burns switched Ms. Friday to yet another pain medication, Tylox, in November 1999, in a continuing effort to provide some relief from her chronic pain. (Tr. 213.) She admitted that she had become depressed and withdrawn and was not often leaving her home, so Dr. Burns prescribed a low dose of the antidepressant Prozac. (*Id.*) At her April 2000 examination, Dr. Burns reported that Ms. Friday's "neuropathy is getting worse; she has more tremors (and) she is dropping things." Her "Raynaud's is getting worse," "her reflux is getting worse," "her sun sensitivity is getting worse," and she has "decreased endurance and weakness." (Tr. 212.) Dr. Burns prescribed a

Schedule II[5] controlled substance opioid analgesic typically used for "severe pain": methadone, 30 mg. daily.  (Tr. 211; *Physician's Drug Handbook*, 658 (9th Ed. 2001)).  He also prescribed the anti-convulsant Neurontin for her tremors and ordered a gastric emptying study for her reflux disease.  (*Id.*)  Ms. Friday improved over the next three weeks on her new medication regimen.  (Tr. 211.)

By her July 2000 appointment with Dr. Burns, her pain was worse despite the fact that she was taking Methadone four times daily in combination with the opioid analgesic hydrocodone four times daily.  (Tr. 214.)  Her motor coordination was also worse.  (*Id.*)  At her August 2000 exam, Dr. Burns thought she was better, but at her October 2000 exam, he thought she was much worse and put her back on the steroid.  (Tr. 283.)  At her January and April 2001 appointments with Dr. Burns, her fatigue was improved and she was functioning well in her home activities, but she continued to trip and fall due to poor coordination.  (Tr. 279-280.)  In July 2001, her depressed mood had lifted and she was happier than she had been "in a long time."  (Tr. 278.)  But by October 2001, she had become depressed again and Dr. Burns prescribed an amphetamine composite medication, Adderall, and restarted her on the antidepressant Zoloft.  (Tr. 277.)  Even with a higher dosage of Zoloft and mental health counseling, Ms. Friday remained depressed at Dr. Burns' last examination of her in February 2002.  (Tr. 275.)

Because Ms. Friday was unable to continue traveling to Houston to see Dr. Burns, she returned to Dr. Itani's care.  (Tr. 336.)  Dr. Itani suspected that Ms. Friday's mood disorder could be related to methadone and weaned her off the drug in January and February 2003.  (Tr. 329-334.)

_____

[5]  Schedule II substances have a high potential for severe psychic or physical dependence. www.pschealth.com.

He first substituted Duragesic, another Schedule II opioid analgesic, and later, Avinza, a time-release capsule form of morphine.  (Tr. 327-332; 325-326; www.fda.gov.)

Ms. Friday began psychiatric treatment with Sandra Davis, M.D., in July 2002.  (Tr. 342-358.)  At her initial evaluation, Dr. Davis recorded Ms. Friday's history of "major depressive disorder for (the) last five years" with current symptoms of anhedonia, poor concentration, social isolation in her home, and panic attacks once weekly with agoraphobia.  (Tr. 354.)  The psychiatrist's formal diagnosis was mood disorder secondary to general medical condition versus substance-induced mood disorder; pain disorder associated with general medical condition and psychological factors; and partner-relational problems.  (Tr. 357.) Dr. Davis rated her new patient's Global Assessment of Functioning ("GAF")[6] at "40." (Tr. 57.)  Notably, Dr. Davis's clinic records, not her later Medical Source Statement, assess Plaintiff's GAF at 40.  The Medical Source Statement describes abilities, not symptoms.  In September 2002, the severity of Ms. Friday's depression was still rated at "moderate to severe."  (Tr. 352.)  However, the following month, Dr. Davis revised her formal diagnosis to major depressive disorder.  (Tr. 350.)

Dr. Davis continued monthly psychiatric sessions with Ms. Friday throughout 2003.  (Tr. 342-347; 520-525.)  At her January 13, February 10, and March 17 appointments, the treating psychiatrist described Ms. Friday's major depressive disorder as "moderate."  (Tr. 344-347.)  Ms. Friday's mood reportedly was improved at her April 21, May 20, and June 23 sessions, but by

---

[6]  The GAF score reports the clinician's judgment of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning."  *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001), citing Amer. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition (1994) ("DSM-IV") as "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work....)."  DSM-IV, at 32.

July 22, Dr. Davis again characterized her patient's depression as "moderate."  (Tr. 342-343; 525; 524.)

Ms. Friday had become even more severely depressed by her September 25, 2003, follow up with Dr. Davis, which she attributed to her estranged husband having raped her the preceding week.  (Tr. 522.)    Thereafter, at her remaining appointments during 2003, on November 2 and December 2, Dr. Davis rated Ms. Friday's depression as no better than "moderate."  (Tr. 511; 510.)

Dr. Davis saw Ms. Friday for 10 sessions in 2004 and another six sessions in the first six months of 2005 and assessed her patient's depression as "moderate" or "moderate – severe" each time.  (Tr. 510-519; 553-558.)   After fully three years as her treating psychiatrist, Dr. Davis completed a questionnaire on July 11, 2005, indicating that Ms. Friday's depressive syndrome was evidenced by seven different signs and symptoms: anhedonia, appetitive disturbance with change in weight, sleep disturbance, psychomotor agitation/retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.[7]  (Tr. 548.)

Dr. Davis rated the limitations caused by Ms. Friday's major depression in the four broad functional areas named in 20 C.F.R. § 404.1520a(c)(3).[8]  Specifically, she rated Ms. Friday's restrictions in activities of daily living as "moderate," her difficulties in maintaining social

---

[7]  The presence of only four of the seven named signs is sufficient to satisfy the paragraph A criteria of the Commissioner's Listing 12.04 regarding Affective Disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04A.

[8]  The four broad areas of functioning named in 20 C.F.R. § 404.1520a(c)(3) are also known as the "B" criteria because they are named in paragraph "B" of mental Listings 12.02, 12.03, 12.04, 12.06, and 12.08.  *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 *4 (July 2, 1996).

functioning as "marked," and her deficiencies of concentration, persistence, or pace as "marked," and quantified her episodes of decompensation at three.[9] (Tr. 549.)

The treating psychiatrist also completed an assessment of Ms. Friday's limitations in performing more detailed mental activities of work, i.e., a Mental Residual Functional Capacity ("RFC") assessment form. (Tr. 551-552.) Dr. Davis rated Ms. Friday's limitations in performing detailed instructions; maintaining attention and concentration; performing activities within a schedule/maintaining regular attendance/being punctual; completing a normal workday/workweek; and responding appropriately to changes in the work setting as "markedly limited," defined as a restriction "precluding performance of the named activity." (*Id.*) At the conclusion of her Mental RFC form, Dr. Davis expressly confirmed that her answers reflected Ms. Friday's mental functioning since July 2002, when she began her treatment. (Tr. 552.)

Non-examining state agency psychiatric consultant Abdelmesih Boulos opined in December 1999, during his review of Ms. Friday's claim at the reconsideration level of review, that her mental impairment was "not severe." (Tr. 187; 194.) Dr. Kenneth Vogtsberger, M.D. performed a one-time consultative examination of Ms. Friday in August 1999 and found her mental status examination unremarkable. (Tr. 167-71.) Notably, Dr. Davis, the treating psychiatrist, was the only mental health professional who rendered an opinion about the severity of Ms. Friday's depressive disorder during the period *after* she began formal psychiatric treatment on July 31, 2002. The ALJ ultimately ruled at Step 4 that Ms. Friday can return to her past relevant work as a customer service representative and, therefore, is not disabled. (Tr. 604.)

---

[9] A rating of "none" or "mild" in each of the first three areas and "none" in the fourth area describes a mental impairment that is "not severe," as contemplated at Step 2 of the sequential evaluation of disability. 20 C.F.R. § 404.1520a(d)(1).

## Analysis

The ALJ's decision is not supported by substantial evidence.  First, the ALJ's stated reasons for disregarding Dr. Davis's assessment are invalid.  ALJ King found, based on the same record, that Ms. Friday's mental impairment was severe.  (Tr. 221.)  By definition, a diagnosis of major depression by an examining psychiatrist cannot be seen as diagnosing "a slight abnormality." Further, doctors are allowed to rely on their patients' descriptions of their conditions. *See Brown v. Barnhart,* 298 F. Supp.2d 773, 792-93 (E.D.Wis. 2004).  Depression does not show on an x-ray. As a specialist, Dr. Davis is presumably trained to scrutinize patient statements.

Finally, the ALJ ignored the District Court's order to obtain expert psychiatric testimony regarding Dr. Davis's assessments.  Instead, the ALJ placed himself in the role of a psychiatric expert, attributing Dr. Davis's GAF assessment of 40 as of July 2002 to Ms. Friday's reaction to a divorce.  Additionally, the ALJ relied upon the internal medicine specialist's testimony that "none of the claimant's impairments met the requirements of any listed impairment."  The ALJ's implication that the "none" in Dr. Eppstein's testimony at the last hearing included Ms. Friday's mental impairment is not supported by the record.

As the Court previously noted, during the ALJ's direct examination of Dr. Eppstein, the ALJ did not ask any questions about the "nature and severity of Ms. Friday's mental impairments on or prior to December 31, 2003."  (Tr. 725-26.)  On cross-examination, Ms. Friday's non-attorney representative raised the issue of whether the assessment of Ms. Friday's psychiatrist would be a valid assessment of functioning.  The internal medicine specialist replied that he would have "*no reason not to accept the psychiatrist's assessment*." [Emphasis supplied]. (Tr. 728.) Dr. Eppstein's testimony at the last hearing about failure to meet a listing did not refer to Dr. Davis's assessment,

as the ALJ implied.  No mental health professional other than the treating psychiatrist, Dr. Davis, rendered an opinion about the severity of Ms. Friday's depressive disorder during the period after she began formal psychiatric treatment on July 31, 2002.

Ms. Friday was considered a person closely approaching advanced age after March 2001. She had a "very good work record," 28 years of employment with Southwestern Bell.  (Tr. 87.) Doctors at the Mayo Clinic in Phoenix, Arizona, diagnosed Ms. Friday with pain disorder, depression, and the autoimmune disease Raynaud's phenomena in April 1997.  (Tr. 123.)   Even after Ms. Friday had to quit work, she attempted to do volunteer work a few hours a day, but had to quit after two weeks due to pain and migraines.  (Tr. 597.)  In April, 1999, Ms. Friday's treating gynecologist opined that Ms. Friday could not work so much as part-time and was totally disabled. In March 1999, Dr. Burns, Ms. Friday's treating rheumatologist also opined that Ms. Friday was totally disabled.  (Tr. 118, 126, 143, 145.)  In July 2000, the treating rheumatologist completed a medical source statement that Ms. Friday was diagnosed with neuropathy and could not perform full-time work due to fatigue.  He limited her from grasping, pushing, pulling, fine manipulation, repetitive motions with her hands, lifting more than four pounds, crawling, bending, squatting, climbing, reach overhead, and sitting, standing, or walking more than a total of one hour each.  (Tr. 211-12, 214-16.)  Ms. Friday was treated with strong narcotic-like medications which made her feel better, but in January 2002, the treating rheumatologist opined that she was still disabled.  (Tr. 276, 278-80, 282.)  In December 2003, she had a pain level of six and good and bad days.  (Tr. 438-42.)

The ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to

accept the conclusions reached by the ALJ." *Id.*   In this case, the ALJ erred by picking and choosing evidence to support a finding of non-disability.  Further, the ALJ's reliance on a non-examining physician's review of medical records and a consultative examination before Ms. Friday began psychiatric treatment, his own lay diagnosis of Plaintiff's depression as directly correlated to her divorce, his finding of non-severe in contravention of ALJ King's previous finding that Plaintiff's depression was a severe mental impairment, and his misstatement of the scope of Dr. Eppstein's testimony about the listings are legal errors that clearly prejudiced Ms. Friday.

The treating psychiatrist assessed Ms. Friday's mental limitations as of and after July 31, 2002, the date she began treating Ms. Friday for depression.  (Tr. 548-52.)  Dr. Davis evaluated, examined, counseled, and prescribed medications for Ms. Friday's depression on July 3, 2002, August 12, 2002, September 3, 2002, September 19, 2002, October 14, 2002, November 11, 2002, and December 16, 2002.  (Tr. 348-59.)  In 2003, Dr. Davis treated Ms. Friday on January 13, February 10, February 27, March 17, April 30, and May 20.  (Tr. 342-47.)  The ME twice testified that he could not identify any reason to reject Dr. Davis's mental assessment of Ms. Friday.  (Tr. 528; 728.)  The VE twice testified that Dr. Davis's assessment of Ms. Friday's mental limitations precluded the performance of Ms. Friday's past work and any other work in the national economy. (Tr. 551-52; 586.)  The ALJ's decision that Ms. Friday's depression is not a severe impairment and that she was not disabled beginning July 31, 2002, is not supported by substantial evidence in light of Dr. Davis's uncontroverted mental evaluation, examinations, and the testimony of the ME and VE.

The court can reverse the ALJ and direct that benefits be paid (as opposed to remanding for further proceedings) where additional fact finding by the ALJ is unnecessary to determine that a

claimant is disabled under the Social Security Act.  *See, e.g., Taylor*, 782 F.2d  at 1299 (reversing decision of ALJ and directing an award of disability benefits); *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (a remand directing an award of benefits is appropriate where "given the available evidence, remand for additional fact-finding would [not] serve [any] useful purpose but would merely delay the receipt of benefits."); *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir.1993) (holding that an award of benefits is appropriate only where all factual issues have been resolved and "the record can yield but one supportable conclusion.").   This Court finds that substantial evidence supports a District Court decision that Ms. Friday was unable to engage in any substantial gainful activity beginning July 31, 2002, by reason of her medically- determinable physical and mental impairments.  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).   Given the administrative agency's obduracy, as evidenced by its actions in this case on multiple remands, the District Court should reverse the Commissioner's decision and remand the case to the agency with directions that the application for benefits be granted.  *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998); *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992); *see Hatcher v. Secretary, Dept. of Health & Human Services*, 898 F.2d 21 (4th Cir. 1989); *Woody v. Secretary of Health & Human Services*, 859 F.2d 1156, 1162-63 (3d Cir. 1988); *Carroll v. Secretary of Health & Human Services*, 705 F.2d 638, 644 (2d Cir. 1983).

## Recommendation

The delay inherent in a fourth remand for further consideration is not warranted.  The District Court should deny the Commissioner's motion to remand with instructions.  It would be futile to give the same explicit directions which Judge Lynn issued in the third remand  -- instructions which the administrative agency did not follow.  The District Court should reverse the Commissioner's

decision and hold that substantial evidence supports an award of benefits under the Act beginning

July 31, 2002.  Further, the District Court should remand this case to the agency with directions that

the application for benefits be granted and for the computation and payment of an award of benefits

beginning July 31, 2002.

SO RECOMMENDED, April 15, 2009.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).